[Cite as *State ex rel. Stinespring-Welch v. Indus. Comm.*, 2018-Ohio-1366.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Grace Stinespring-Welch, | : | |
| Relator, | : | |
| v. | : | No. 16AP-878 |
| Susan C. Miller, | : | (REGULAR CALENDAR) |
| Millers Reliable Waste Service et al., | | |
| | : | |
| Respondents. | | |
| | : | |

D E C I S I O N

Rendered on April 10, 2018

**On brief:** *Richard L. Williger Co., LPA,* and *Richard L. Williger,* for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Amanda B. Brown,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

KLATT, J.

{¶ 1} Relator, Grace Stinespring-Welch, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate the September 6, 2016 order of its staff hearing officer ("SHO") denying her application for permanent total disability ("PTD") compensation, and to enter an order that grants said compensation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who issued a decision, including findings of fact and

conclusions of law, which is appended hereto. The magistrate found that Dr. Tosi's report provides some evidence supporting the commission's denial of PTD compensation. The magistrate further found that contrary to relator's contention, Ohio Adm.Code 4121-3-34(D)(3)(i) does not require a "combined effects" review. Therefore, the magistrate has recommended that we deny relator's request for a writ of mandamus.

{¶ 3} Relator has filed objections to the magistrate's decision. In her first objection, relator contends that Dr. Tosi's report constitutes only a "scintilla" of evidence when compared with the reports of Dr. Weinstein and Dr. Aronson. According to relator, because the reports of Dr. Weinstein and Dr. Aronson are more recent and persuasive, Dr. Tosi's report is not "some evidence" on which the commission could rely in denying relator PTD compensation. We disagree.

{¶ 4} Relator is essentially asking this court to reweigh the medical evidence. That is not our role. It is well-established that the commission is the trier of fact and this court will not substitute its judgment for that of the commission. *State ex rel. Honda of Am. Mfg. Co., Inc. v. Indus. Comm.*, 10th Dist. No. 14AP-82, 2014-Ohio-5245, ¶ 10 (the commission is the exclusive evaluator of factual evidence in determining whether an individual is entitled to compensation). The presence of conflicting medical evidence does not invalidate Dr. Tosi's report. Because Dr. Tosi conducted his examination less than 24 months prior to relator's PTD application, his report is not stale. Ohio Adm.Code 4121-3-34(C)(1). Dr. Tosi's report is more than a "scintilla" of evidence. Because Dr. Tosi's report is some evidence on which the commission could rely, the commission did not abuse its discretion in denying relator's application for PTD compensation. Therefore, we overrule relator's first objection.

{¶ 5} In her second objection, relator contends that the magistrate should have found that the commission failed to consider whether the allowed psychiatric condition in combination with the allowed physical condition prevented relator from engaging in sustained remunerative employment as required by Ohio Adm.Code 4121-3-34(D)(3)(i). Again, we disagree.

{¶ 6} Contrary to relator's contention, the commission did consider whether relator's psychiatric condition in combination with her allowed physical condition prevented her from engaging in sustained remunerative employment. The commission

specifically considered the report of Paul Scheatzle, D.O., who opined that relator was capable of light work with some restrictions.  The commission then considered Dr. Tosi's report in connection with her allowed psychological condition.  The commission discussed both doctor's reports in determining that relator was not entitled to PTD.  Relator has not shown that the commission applied an incorrect legal standard or abused its discretion in denying relator PTD compensation.  Therefore, we overrule relator's second objection.

{¶ 7} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law.  Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.  In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.

*Writ of mandamus denied.*

BROWN, P.J., and BRUNNER, J., concur.

———————————

## APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Grace Stinespring-Welch, | : | |
| Relator, | : | |
| v. | : | No. 16AP-878 |
| Susan C. Miller, Millers Reliable Waste Service et al., | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

### M A G I S T R A T E ' S   D E C I S I O N

Rendered on November 1, 2017

*Richard L. Williger Co., LPA,* and *Richard L. Williger,* for relator.

*Michael DeWine*, Attorney General, and *Amanda B. Brown,* for respondent Industrial Commission of Ohio.

IN MANDAMUS

**{¶ 8}** In this original action, relator, Grace Stinespring-Welch, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the September 6, 2016 order of its staff hearing officer ("SHO") that denies relator's application for permanent total disability ("PTD") compensation, and to enter an order granting the compensation.

Findings of Fact:

**{¶ 9}** 1. On October 4, 2008, relator was industrially injured while employed by respondent Miller's Reliable Waste Service, a state-fund employer. On that date, relator was attacked by a co-worker.

{¶ 10} 2. Following a March 8, 2011 hearing, the three-member commission allowed the claim (No. 08-885911) for "Sprain right wrist, lumbar sprain and post traumatic stress disorder."  The commission also awarded temporary total disability ("TTD") compensation beginning October 14, 2008 to March 8, 2011.  Further, TTD compensation was to be paid upon submission of additional medical evidence of continued TTD.

{¶ 11} 3. On September 30, 2011, relator was initially examined and treated by psychologist David Aronson, Ph.D.  In his office notes, Dr. Aronson wrote:

> The diagnosis of Prolonged Post Traumatic Stress (309.81) is accurate. Ms. Stinespring continues to exhibit severe symptoms of this disorder and continues to be very impaired as a result of the psychological and emotional symptoms experienced.

{¶ 12} 4. On July 23, 2014, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by psychologist Donald J. Tosi, Ph.D.  He issued a seven-page narrative report.

{¶ 13} In his report, under the caption "Review of Records," Dr. Tosi lists the dates of 23 reports from Dr. Aronson that he reviewed following receipt of a "referral packet provided by the BWC."  The list chronologically begins with an August 2, 2013 report and ends with a June 6, 2014 report.

{¶ 14} Under the caption "History of Present Illness," Dr. Tosi states:

> The Injured Worker[] participated in physical therapy and pain management (at Canton Pain Management). The Injured Worker has been under psychological treatment with Aronson, psychologist, for "three years," currently every two weeks. She has consulted Dr. Mohan, psychiatrist, for "at least three years," currently every other month. Prolonged Post-Traumatic Stress Disorder (309.81) is allowed in this claim. Diagnostic tests/procedures include MRIs, x-rays and an EMG. There were no injury-related surgeries. Medications include Lamictal, Lexapro and Invega. She takes no prescription pain medication. Past medications include Escitalopram and Abilify. The Injured Worker has not participated in vocational rehabilitation. She states, "We are talking about that now."

{¶ 15} Under the caption "Mental Status Examination," Dr. Tosi states:

Cognitively, the Injured Worker appears to be a woman of average intelligence. She is alert and oriented in all spheres with adequate reality contact. Concentration and attention are unimpaired. Comprehension of simple commands is unimpaired. Stream of thought and flow of ideas are normal. Educational deficits are absent. There is no evidence of cognitive dysfunction due to psychoses, head injury, or organicity. Perseveration/fragmentation, delusions, and flight of ideas are absent. The Injured Worker expresses her thoughts clearly and understandably. Thinking is goal-directed. Her associations are reasonably well organized. Memory functions are generally intact in all time frames. She gave a reasonable account of her activities and life events in chronological order. Abstract reasoning, concept formation, and fund of knowledge are estimated to be within normal limits. She has a functional understanding of everyday objects. Judgment is fair. She has a history of dysfunctional marriages. Executive functions such as decision making, flexibility, and social perceptions are intact.

Under the caption "Opinion," Dr. Tosi answers six questions:

**Question 1: Has the Injured Worker reached a treatment plateau that is static and well-stabilized, at which no fundamental, functional, or psychological change can be expected within reasonable medical probability in spite of continuing medical treatment or rehabilitative procedures (maximum medical improvement)? Include rationale for your decisions.**

The claim is allowed for Post-Traumatic Stress Disorder (PTSD). Post-Traumatic Stress Disorder typically requires thirteen to twenty psychotherapy sessions (ODG, 2012, 17th edition). The Injured Worker has been under psychological/psychiatric treatment for "at least three years." Unrelated factors contribute to the Injured Worker's emotional distress post-injury (i.e., stepdaughter placed in respite care, 2014; divorced from second husband, 2011; Injured Worker sues employer and was in litigation, 2009-2011; partial removal of thyroid, 2010; gallbladder surgery, 2011; kidney stent, 2011). The Injured Worker has reached maximum medical improvement.

**Question 2: Can the Injured Worker return to his/her former position of employment? If yes, are there any restrictions or modifications?**

PTSD would prevent the Injured Worker from returning to her former position of employment.

**Question 3: Please provide a summary of any functional limitations solely due to the psychological condition(s) in this claim(s). In other words, please indicate the type of work the Injured Worker can perform and supportive rationale for your opinion.**

The Injured Worker is able to function in a low to moderate work stress situation.

**Question 4: Are there any recommendations for vocational rehabilitation?**

Vocational rehabilitation should be considered.

**Question 5: Is the current treatment necessary and appropriate for the psychological condition(s)?**

Treatment to date is appropriate for PTSD.

**Question 6: What are the recommendations for any proposed plan of treatment including the expected length of treatment and results?**

The Injured Worker should consult her psychologist once a month over the next three to five months. Psychiatric visits should be every three months over a six month period. Psychiatric/psychological treatment should be for purposes of maintenance.

{¶ 16} 5. On August 15, 2014, following the issuance of Dr. Tosi's report, Dr. Aronson wrote the following office note:

In today's session, Grace and I talked about the IME psychological report completed by Dr. Tosi, dated 07/23/2014. Dr. Tosi opined that Grace has reached maximum psychological improvement (MMI) with regard to her BWC allowed psychological disorder (post traumatic stress disorder; PTSD). We also discussed the communication I received from the BWC asking for my opinion about the issue of MMI. The purpose of this note is to communicate my opinion about this issue and to outline the current plan of treatment. After careful consideration, it is my professional opinion that Grace has reached maximum psychological improvement (MMI) with regard to her post traumatic stress

disorder as of today (08/15/2014). I do expect that she will make additional small improvements in the future; however, these are not the type of improvements that would result in substantial functional change. Over the past few months, Grace and I have been discussing a plan for her return to work in a manner that she can tolerate and that will not cause her PTSD to worsen. Grace has great difficulty around others, especially if she does not know them. Her work situation must be one that takes this into account. Grace has an established relationship with the owner of a dry cleaning business. Prior to her injury, Grace had worked for this man by ironing shirts and doing seamstress work. Grace engaged in these activities in her own shop as part of her own business that she had established. This man is willing to have Grace resume ironing of shirts, as the need arises. The plan is for Grace to engage in this remunerative activity in her own home. By doing this in her home, the probability of success is much higher because the stress level for Grace is lower. This work will need to be part-time in nature. Initially, the goal is for Grace to iron 50 shirts per week. The number may increase in the future as her ability improves and based on this man's business needs. During this time, Grace will need to continue involvement in psychological and psychiatric treatment in order to maximize the probability of success, to maintain gains she has made and to prevent deterioration.

{¶ 17} 6. Following an October 31, 2014 hearing, an SHO issued an order terminating TTD compensation as of August 15, 2014 based on a finding that the allowed psychological condition has reached maximum medical improvement ("MMI"). The SHO relied exclusively on the August 15, 2014 office note of Dr. Aronson. 7. Following a February 12, 2016 office visit, Dr. Aronson wrote:

Over the past six months, Grace Stinespring Welch and I have met for psychological therapy sessions every eight weeks; the sessions have focused on maintaining reasonable control over her post traumatic stress (PTSD) and preventing deterioration. In addition to our meetings, Grace has received psychiatric medication management sessions from Dr. Mohan. * * * Unfortunately, Grace has demonstrated some deterioration in her PTSD. She is spending more time in bed. She is more anxious about being around people she does not know and she has found it impossible to continue carrying out tasks and activities she was doing three months ago. As an example, she recently went to the grocery store and had to leave after getting only a few things (instead of everything on her shopping list)

due to her anxiety increasing dramatically. Another example of her decreased functioning is that she had been preparing healthy meals for the family and felt very proud of this accomplishment. At this point, she has been unable to continue this activity and has been relying on take-out food. She is not even able to eat in a restaurant because of the worsening of her PTSD. She feels guilty about this because she knows that her family is eating in a less healthy manner. Grace and I discussed this and we decided that we do need to increase the frequency of her psychological therapy sessions to once every six weeks on average (instead of once every eight weeks). This results in an increase of one session over six months (5 sessions total). Her psychiatric medication management sessions can remain at once every eight weeks (4 sessions). * * * **At this point, it is my opinion, within a reasonable degree of psychological certainty, that Grace Stinespring Welch is unable to engage in any sustained remunerative employment solely due to impairment from her BWC allowed psychological condition (PTSD). As such, I believe that she is permanently and totally disabled. Further, she would be unable to participate in vocational rehabilitation services. This is because of the severity of her PTSD and the probability that participation in vocational rehab would worsen her allowed psychological condition.**

(Emphasis sic.)

{¶ 18} 8. On April 22, 2016, relator filed an application for PTD compensation. In support, relator appended to her application the February 12, 2016 office note of Dr. Aronson.

{¶ 19} 9. On June 13, 2016, at the commission's request, relator was examined by Paul T. Scheatzle, D.O. In his three-page narrative report, Dr. Scheatzle opines:

> **Discussion:** Ms. Stinespring is a 54 year old female 8 years status post right wrist sprain and lumbar sprain injuries with complaints of chronic low back and right wrist pain. She has been through conservative care. She had a hand surgery evaluation as well as pain management interventions. Currently no further injections or surgery are planned and she has completed therapy. She remains on medications for symptoms related to her allowed conditions and reports some activity limitations due to symptoms related to her allowed conditions.

The injured worker has reached maximum medical improvement. Her condition has plateaued and is not expected to change further. It can be stated with a reasonable degree of medical probability that with ongoing medical or rehabilitation procedures that no further fundamental, functional or physiologic improvement can be expected.

With regards to her sprain right wrist and lumbar sprain injuries she is capable of light duty work activities with lifting up to 20 lbs occasionally or 10 lbs more frequently. Would recommend occasional use of the right hand for work activities with no repetitive wrist flexion extension motions. Should use good lift techniques and body mechanics for all work activities.

{¶ 20} 10. On July 12, 2016, at the commission's request, relator was examined by psychologist, Donald J. Weinstein, Ph.D. In his six-page narrative report, Dr. Weinstein opined that relator has a 24 percent whole person impairment related to the allowed psychological condition.

{¶ 21} 11. On July 12, 2016, Dr. Weinstein also completed a form captioned "OCCUPATIONAL ACTIVITY ASSESSMENT, Mental & Behavioral Examination." On the form, Dr. Weinstein indicated by his mark "[t]his Injured Worker is incapable of work."

{¶ 22} 12. Following a September 6, 2016 hearing, an SHO issued an order denying the PTD application. The SHO's order explains:

On 10/04/2008, the Injured Worker was injured when a "co-worker" grabbed her right forearm, twisted and threw her to the ground. The Injured Worker had conservative treatment for the allowed physical conditions and is not currently treating in the claim. The Injured Worker treats the allowed psychological condition with counseling, currently one time every six weeks, and medication.

Paul T. Scheatzle, D.O. examined the allowed physical conditions of the claim on behalf of the Industrial Commission. In his 06/13/2016 report, Dr. Scheatzle opined that the allowed physical conditions had reached maximum medical improvement and that there was an 8% whole person impairment due to those conditions. Based upon his examination of the Injured Worker, Dr. Scheatzle opined that the Injured Worker was capable of light work with occasional use of the right hand and no repetitive wrist flexion/extension motion.
* * *

Donald J. Tosi, Ph.D. examined the Injured Worker on the allowed psychological condition on behalf of the Administrator for purposes of determining whether same had reached maximum medical improvement. Dr. Tosi found that the allowed psychological condition had reached maximum medical improvement.

Based upon this examination of the Injured Worker, Dr. Tosi found that the Injured Worker is able to function in a low to moderate work stress work situation and that vocational rehabilitation should be considered.

The opinions of Dr. Tosi and Dr. Scheatzle are found persuasive, and are adopted by the Staff Hearing Officer. Based on the 07/23/2014 report of Dr. Tosi and the 06/13/2016 report of Dr. Scheatzle, the Staff Hearing Officer finds that the Injured Worker is capable of performing light work with occasional use of the right hand with no repetitive wrist flexion/extension motion in a low to moderate work stress situation.

As it has been found that the Injured Worker is capable of light work with the restrictions set forth above, an analysis of the Injured Worker's non-medical disability factors is appropriate pursuant to *State ex rel. Stephenson v. Industrial Commission* [31 Ohio St.3d 167 (1987)].

The Injured Worker is 54 years old as of the time of hearing. She is considered a person approaching middle age. The Staff Hearing Officer finds that the Injured Worker has at least nine years of productivity left in the work force before she would reach an age when individuals traditionally retire. However, many individuals work beyond the traditional age of retirement. The Staff Hearing Officer finds there is sufficient time remaining for the Injured Worker to look for work within her restrictions and/or to retrain on a short-term basis for work within her restrictions. As such, the Staff Hearing Officer finds that the Injured Worker's age is a positive vocational factor.

The Staff Hearing Officer finds that the Injured Worker's educational history is also a positive factor. The Injured Worker is a high school graduate which is evidence of the abilities to read, write, and perform basis [sic] math. These skills are helpful in the performance of light and sedentary work. Additionally, the record indicates the Injured Worker took

classes at Stark State Technical College. The Injured Worker testified she took one algebra class.

The Staff Hearing Officer also finds that the Injured Worker's work history is a positive vocational factor. The Injured Worker testified that she ran her own alteration and repair business for 28 years, up until 2008. This business had its own store front and the Injured Worker had an average of three employees at any time. The Injured Worker testified she kept her own business records, did taxes with the assistance of a paid preparation service, hired, fired, and supervised employees, did payroll, and used a sewing machine. The Staff Hearing Officer finds that from this job the Injured Worker developed transferrable skills in customer service, working to precise tolerances, following directions, supervising others and keeping business records. Further, it appears that this type of work, sewing and alterations, would be within the Injured Worker's current work restrictions.

From June 2008 through October 2008, the Injured Worker worked for the employer of record performing primarily office work which involved answering the phones, billing, routing trucks and using the computer. IC-2 indicates the job involves sitting eight hours per day and lifting up to 10 pounds frequently. The Injured Worker indicates she also occasionally worked on the trash trucks. The Staff Hearing Officer finds that the Injured Worker's office component of this job also appears within her current restrictions. Thus, office work for a different employer is an option for the Injured Worker. A short-term computer class to teach basic skills needed in today's job market would not be unreasonable. This job gave the Injured Worker transferrable skills in entering data into a computer to generate bills, in customer service from answering phones and in following instructions.

The IC-2 indicates the Injured Worker last worked in 2008. However, there is also an indication the Injured Worker ironed shirts at home for a one month period in 2015. The IC-2 indicates the Injured Worker didn't feel she had adequate time to prepare meals and carry out other daily activities while performing this work. The Injured Worker testified she worked up to 10 hours per week. The Injured Worker testified that she has not looked for work since she stopped ironing shirts approximately one year ago.

The Staff Hearing Officer finds that the Injured Worker also has engaged in personal activity for which she could perform

the same activity for remuneration. The Injured Worker testified that she drives her granddaughter to school and also picks her up after school and watches her 2-3 days a week. Additionally, the Injured Worker's stepson is mentally challenged. Although a health aid is provided to the stepson, the Injured Worker testified that her husband also receives government funds to provide care for his son as well. The Injured Worker testified that she does assist in providing some of the care for which her husband is compensated. It appears that transportation jobs, for instance after school vans or for light parts or transportation of vehicles between locations, would be within the Injured Worker's current restrictions. Further, some child care positions may be within the Injured Worker's current restrictions. The Staff Hearing Officer finds that the Injured Worker is performing duties consistent with these types of jobs currently.

The Staff Hearing Officer finds that permanent total disability is compensation of last resort to be awarded only after all reasonable efforts to return to work at sustained remunerative employment have failed. *State ex rel. Wilson v. Industrial Commission* (1997), 80 Ohio St.3d 250. It is not unreasonable to expect an Injured Worker to participate in a return to work effort or to take the initiative to improve their re-employment potential. *State ex rel. Wilson.* The Injured Worker has not attempted any vocational rehabilitation. Further, despite a number of transferrable skills and a positive work history, the Injured Worker has not made a good faith attempt to look for work. The Injured Worker tried ironing at home for a one month period, up to 10 hours a week approximately one year ago. Per her application, this job interfered with her activities at home. There has been no other effort to look for suitable work or to retrain for same in the last year. The Staff Hearing Officer finds that the Industrial Commission can demand accountability of an Injured Worker who despite the time and medical ability to do so, does not try to further their education or learn new skills. *State ex rel. Bowling v. National Can Corp.* (1996), 77 Ohio St.3d 148. The failure to retrain for work within ones restrictions and/or to look for work within ones restrictions is a significant factor in denying this compensation of last resort. The Staff Hearing Officer finds that Injured Worker has not exhausted all reasonable efforts to return to work at sustained remunerative employment.

Accordingly, the request for Permanent Total Disability benefits is denied. The Staff Hearing Officer finds that the Injured Worker's disability is not total and that she is capable

of performing sustained remunerative employment or being retrained for sustained remunerative employment.

{¶ 23} 13. On October 19, 2016, the three-member commission mailed an order denying relator's request for reconsideration of the SHO's order of September 6, 2016.

{¶ 24} 14. On December 23, 2016, relator, Grace Stinespring-Welch, filed this mandamus action.

Conclusions of Law:

{¶ 25} The commission, through its SHO, relied exclusively on the report of Dr. Tosi in determining the mental component of residual functional capacity. Ohio Adm.Code 4121-3-34(B)(4).

{¶ 26} The main issue is whether Dr. Aronson's office notes reporting clinical findings and circumstances occurring after the issuance of Dr. Tosi's July 23, 2014 report have destroyed the evidentiary value of Dr. Tosi's report such that it cannot provide the some evidence supporting the denial of the PTD application.

{¶ 27} Finding that Dr. Tosi's report provides some evidence supporting the commission's decision notwithstanding Dr. Aronson's subsequent reporting of clinical findings and circumstances, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

{¶ 28} Citing this court's decision in *State ex rel. Lloyd v. Indus. Comm.*, 10th Dist. No. 07AP-79, 2007-Ohio-5020, relator argues that Dr. Tosi's report was issued "significantly before Grace began working, and her subsequent decompensation as a result there." (Relator's brief at 7.) Relator asserts that Dr. Tosi's report is thus "so devoid of any contemporaneous information" that "fairness is simply not in play." (Relator's brief at 7.)

{¶ 29} In an apparent reference to Ohio Adm.Code 4121-3-34(C)(1)'s requirement that the medical examination supporting the PTD application be conducted within 24 months prior to the filing of the application, relator asserts that Dr. Tosi's report "was just on the edge of being a 'stale' document." (Relator's brief at 7.)

{¶ 30} It can be noted that this court's decision in *Lloyd* was premised on a decision of the Supreme Court of Ohio in *State ex rel. Sellards v. Indus. Comm.*, 108 Ohio St.3d 306, 2006-Ohio-1058. Thus, a review of the *Sellards* case is in order.

**The *Sellards* Case**

{¶ 31} William E. Sellards, Jr., injured his back in an industrial accident in 1998. He reached MMI for his back injury in January 2001. In November 2001, he began seeing a psychiatrist, Dr. J.T. Spare, for depression.

{¶ 32} On July 17, 2002, the commission additionally allowed the claim for "major depressive disorder, single episode." *Id.* at ¶ 3. On October 17, 2002, Dr. Spare submitted a C-9 treatment plan application that sought approval for psychotherapy and "medication management." *Id.* That application was approved by the commission on October 22, 2002.

{¶ 33} Coincidentally, also on October 22, Sellards was examined by another psychiatrist, Dr. Allan B. Levy, concerning the extent of his psychiatric disability. After examining Sellards and thoroughly reviewing the records (which did not include Dr. Spare's treatment plan), Dr. Levy concluded that Sellards' psychiatric condition was at MMI.

{¶ 34} On November 26, 2002, Dr. Spare responded to Dr. Levy's report. Dr. Spare indicated that Sellards was having a problem getting his medications filled at the pharmacy, and that this problem was adversely effecting his treatment. This letter was the first mention of any problem with payment for medication. On December 23, 2002, Sellards' counsel phoned the bureau regarding prescription payment. The bureau responded with a letter the next day indicating that an error had occurred and, as of that date, had been corrected.

{¶ 35} At about the same time, a district hearing officer ("DHO") found that Sellards had reached MMI based on Dr. Levy's report and, therefore, terminated TTD compensation as of the December 18 hearing date. Sellards appealed and obtained another letter from Dr. Spare. The letter, dated January 7, 2003, reiterated that Sellards' antidepressant treatment has been, to some extent, limited as Dr. Spare had to rely on office samples for treatment, rather than a prescription.

{¶ 36} Following a February 6, 2003 hearing, an SHO affirmed the DHO's decision to terminate TTD compensation on MMI grounds. Further appeal and an additional request for reconsideration were denied. Sellards then filed a mandamus action in this court. This court denied the writ.

{¶ 37} On appeal as of right to the Supreme Court of Ohio, the *Sellards* court reversed the judgment of this court. The *Sellards* court explains:

The single issue presented is an evidentiary one. Sellards challenges Dr. Levy's opinion of maximum medical improvement as premature based on Dr. Spare's contemporaneously approved treatment plan and urges its disqualification. We agree with Sellards and accordingly reverse the judgment of the court of appeals.

Prior to his examination by Dr. Levy, Sellards struggled to get the treatment recommended by his treating physician, Dr. Spare, who believed that Sellards would benefit from medication and psychotherapy. The commission, in approving that treatment, obviously wanted to give Sellards the opportunity for further treatment. We believe that Sellards merits that opportunity before maximum medical improvement is assessed. Dr. Levy's opinion was premature based on the commission's contemporaneous approval of Dr. Spare's treatment program. Dr. Levy's opinion could not, therefore, serve as evidence supporting denial of temporary total disability compensation.

*Id.* at ¶ 19-20.

## The *Lloyd* Case

{¶ 38} Errol D. Lloyd, Jr., was injured on January 11, 2005. His industrial claim was allowed for "electrical shock." *Lloyd* at ¶ 4.

{¶ 39} Following his injury, Lloyd was referred for a psychiatric evaluation due to the anxiety he was experiencing. This eventually led to a claim allowance for post traumatic stress disorder and depression disorder. He was awarded TTD compensation due to his psychological condition. *Id.*

{¶ 40} Lloyd's employer, Centimark Corporation, had Lloyd evaluated by Michael E. Miller, M.D., who concluded in a March 22, 2006 report, that Lloyd was being deceptive about a number of matters, including his chemical dependency history and reporting of symptoms. *Id.* at ¶ 5. Dr. Miller also opined that Lloyd had reached MMI. *Id.* at ¶ 32.

{¶ 41} William C. Melchior, Ed.D., was treating Lloyd for his psychological condition and requested authorization from Centimark, a self-insuring employer, to increase treatment. Instead, Centimark filed a motion to terminate TTD compensation based on Dr. Miller's report.

{¶ 42} A DHO granted Centimark's motion to terminate TTD compensation. On appeal to an SHO, the DHO's order was affirmed on grounds that Lloyd had reached MMI. *Id.* at ¶ 33.

{¶ 43} Following the filing of a mandamus action in this court, the action was assigned to a magistrate. The magistrate recommended that the writ issue. Adopting the magistrate's decision, this court explained:

> The course of treatment for relator had not yet been approved when Dr. Miller examined relator.
>
> The new course of treatment changed the treatment from monthly to weekly. Dr. Miller was unaware of both the past treatment and the future treatment plan when he wrote his report. Applying *Sellards,* Dr. Miller's report could not constitute some evidence to support a finding that relator had reached MMI.

*Id.* at ¶ 8, 9.

### Analysis

{¶ 44} Clearly, neither the *Sellards* case nor the *Lloyd* case compels the conclusion urged by relator—that the evidentiary value of Dr. Tosi's July 23, 2014 report has been destroyed by the subsequent office notes of Dr. Aronson.

{¶ 45} In *Sellards,* Dr. Levy's opinion was held to be "premature" because the commission contemporaneously approved Dr. Spare's treatment program at the time Dr. Levy rendered his MMI opinion. *Id.* at ¶ 20. Significantly, there was no dispute that the commission had contemporaneously approved Dr. Spare's treatment program.

{¶ 46} In *Lloyd,* this court held that Dr. Miller's MMI opinion could not be relied on by the commission to support termination of TTD compensation because Dr. Melchior's request to increase treatment was approved subsequent to Dr. Miller's opinion. In *Lloyd*, as in *Sellards,* there was no factual dispute that the requested change of treatment plan had been approved.

{¶ 47} Here, the February 12, 2016 office visit note presents Dr. Aronson's observations and opinions regarding relator's medical status. As earlier noted, Dr. Aronson opined that relator "has demonstrated some deterioration in her PTSD" and that she is "unable to engage in any sustained remunerative employment." Those clinical observations

and medical opinions were very much in dispute in the adjudication of the PTD application. It is the commission that weighs the medical evidence before it. Here, the commission apparently rejected Dr. Aronson's opinions contained in his February 12, 2016 office visit note and instead relied on the report of Dr. Tosi.

{¶ 48} Relator's argument for the elimination of Dr. Tosi's report from evidentiary consideration because Dr. Aronson subsequently issued contrary opinions is untenable. Again, neither *Sellards* nor *Lloyd* support relator's position.

### Ohio Adm.Code 4121-3-34(D)(3)(i)

{¶ 49} Relator further argues that the SHO's order of September 6, 2016 fails to comply with Ohio Adm.Code 4121-3-34(D)(3)(i), which provides:

> In claims in which a psychiatric condition has been allowed and the injured worker retains the physical ability to engage in some sustained remunerative employment, the adjudicator shall consider whether the allowed psychiatric condition in combination with the allowed physical condition prevents the injured worker from engaging in sustained remunerative employment.

{¶ 50} According to relator, the SHO's order of September 6, 2016 "does not contain a combined effects review" as required by the above-quoted rule. (Emphasis omitted.) (Relator's brief at 6.) According to relator, "[e]ven a cursory review of the SHO decision * * * reveals that this was not done." (Relator's brief at 7.) Relator cites to no authority other than the rule itself. Moreover, the rule does not contain the term "combined effects review" used by relator here. Rather the rule provides that the adjudicator shall consider the allowed psychiatric condition *in combination* with the allowed physical condition.

{¶ 51} In *State ex rel. Guy v. Indus. Comm.*, 10th Dist. No. 08AP-711, 2009-Ohio-2553, this court states:

> In the end, relator's contentions invoke the formerly required "combined effects" review that arose when the claimant presented both physical and psychological dimensions in a request for disability compensation. Under such a review, typically a single doctor assessed a claimant's ability in light of the combined effects of the allowed physical and psychological conditions. Ohio Adm.Code 4121-3-34(D)(3)(i) does not require a "combined effects" review, but rather that the conditions be considered in combination. Because the staff

> hearing officer's order does so, relator's single objection is overruled.

*Id.* at ¶ 8.

{¶ 52} Apparently, relator confuses the formerly required "combined effects" review with the language contained at Ohio Adm.Code 4121-3-34(D)(3)(i). Accordingly, relator's argument lacks merit.

{¶ 53} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).